UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SARA GONZALEZ FLAVELL,

    *Plaintiff*,

v.

REBECCA PATTERSON COLLIER, *et al.*,

    *Defendants.*

No. 20-cv-0959 (DLF)

**MEMORANDUM OPINION**

Sara Gonzalez Flavell, proceeding *pro se*, brings this action alleging eight claims including negligence, medical practice, fraud, negligent misrepresentation, tortious interference with a contract or business relationship, intentional infliction of emotional distress, violation of the Mental Health Information Act, and violation of the Nurse Practice Act. Before the Court is the defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, Dkt. 21, and the plaintiff's Motion for Leave to File Surreply, Dkt. 25. For the reasons that follow, the Court will grant the plaintiff's motion for leave to file a surreply[1] and grant the defendants' motion to dismiss.

**I.    BACKGROUND**

    **A.  Factual Background**

---

[1] The defendants first argued that Flavell's employment was at-will in their reply. *See* Defs.' Reply Mem. at 10, Dkt. 24. Accordingly, the Court will grant Flavell's motion for leave to file a surreply. *See Longwood Vill. Rest., Ltd. v. Ashcroft*, 157 F. Supp. 2d 61, 68 n. 3 (D.D.C. 2001) (explaining that to succeed on a motion for leave to file a surreply, a party must show that "the reply filed by the moving party raised new arguments that were not included in the original motion").

In May 2015, Flavell, then an employee at the International Bank for Reconstruction and Development, applied to her employer's disability program after "suffering trauma from workplace abuse."  Second Am. Compl. ¶ 5, Dkt 20.[2]  Defendant Reed Group is a third-party company responsible for administering the International Bank for Reconstruction and Development disability program.  Def.'s Mem. in Supp. of Mot. to Dismiss at 3, Dkt. 21.  Defendant Collier, an employee of Reed Group, was the nurse case manager assigned to administer Flavell's disability leave, but she did not treat Flavell.  *Id.*; Compl. ¶ 6.  Instead, Flavell's medical care was provided through independent medical examinations conducted by physicians outside of Reed Group.  *See* Compl. ¶ 8.

On June 30, 2015, Collier contacted Flavell in order to introduce herself and speak about the disability program.  Compl. ¶ 6.  Flavell alleges that Collier told her: "(i) Plaintiff's medical information and records would be maintained confidential, including from her employer.  (ii) For disability leave extension, the Plaintiff's treating physician's Statement of Claim would be necessary . . . [.]  Disability leave could not be approved without an operative treating physician[']s Statement of Claim for each period.  (iii) On recovery Plaintiff would be required to provide Reed Group's standard Return to Work (RTW) Form signed by her treating physician as medical evidence."  *Id.* ¶ 7.

Flavell remained on short-term disability leave from June 2, 2015, until June 1, 2017.  Pl.'s Opp'n Ex. 3, at 2, Dkt. 23.  Her time on disability was measured in eight periods of roughly three months each.  *Id.*  For the first seven of these periods, Flavell submitted a statement from her treating physician that supported her need to continue in the disability program.  Compl. ¶

---

[2] The amended complaint at Dkt. 20 is, in fact, plaintiff's second amended complaint, not her first as she has titled it.  *See generally* Am. Compl., Dkt. 10.  For clarity, the Court will refer to the operative complaint at Dkt. 20 as the "Second Amended Complaint" ("Compl.").

11–12.  But Flavell alleges that during her seventh physician visit, which provided support for her short-term disability period between December 19, 2016, and March 19, 2017, her physician informed her that she would soon be medically fit to return to work.  *Id.* ¶ 11.  Flavell alleges that on or about December 16, 2016, she shared this information with Collier and requested information regarding the process for returning to work.  *Id.*  According to Flavell, "Collier confirmed [Flavell] would not require further [independent medical evaluations] and could return" once she "provid[ed] her treating physician's RTW form."  *Id.*

In January 2017, employees from the Reed Group scheduled an unexpected independent medical evaluation for Flavell with a different physician than the one she was seeing previously.  *Id.* ¶ 13.  In her communications with various Reed Group employees, Flavell was told that Reed Group requested this independent medical evaluation for the purpose of determining her eligibility for long-term disability leave as is their policy when a claimant approaches the end of their available short-term disability.  *See* Pl.'s Opp'n Ex. 4, at 2–5.  Reed Group employees scheduled two different independent medical evaluations for Flavell, neither of which she claims to have attended.  *Id.*  And around this time, Flavell revoked Reed Group's authorization to share her medical information.  *See id.* at 4 ("Reed group had no authorization on file and knew this.").

On March 16, 2017, Flavell's treating physician signed Reed Group's "Release to Work" form, indicating that Flavell was medically fit to return to work starting on March 19, 2017.  Compl. Ex. 1.  Flavell then submitted this form to Reed Group.  Three days later Flavell presented for work, but she was not allowed into her office because her return to work form had not been approved by Reed Group.  Compl. ¶ 15.

Afterwards, Flavell was notified that, against her wishes, she had been approved for another period of short-term disability from March 20, 2017, to June 1, 2017.  *See id.* ¶ 37.  Reed

3

Group employees also informed Flavell that, in order to update her claim and process her return to work form, she would have to sign an authorization for release of medical information. *See* Pl.'s Opp'n Ex. 4, at 10. In response, Flavell sent Reed Group employees an email in which she provided, in her own words, certain authorizations for Reed Group to receive information from her doctor. *See id.* at 11 (stating that she "offer[ed] to provide further authorizations if" Reed Group "specif[ied] exactly which doctors and/or medical facilities or others [it] need[ed] to contact for further information (ideally also stating the medical information necessary)"). Flavell does not claim to have ever signed the medical record release authorization provided to her by Reed Group. *See* Compl.

Flavell claims that she returned to work in June 2017. Compl. ¶ 40. But she does not explain whether that return was authorized by Reed Group. And though Flavell was later terminated from her position, she does not provide the date of her termination in any of her pleadings. *See, e.g.*, Pl.'s Opp.'n at 24 ("Plaintiff was terminated and did not resign"). In January 2018, Flavell appealed her case decisions by Collier and Reed Group under the disability program's Administrative Review Panel. Compl. ¶ 51. She claims that during this review, Reed Group "made fraudulent or reckless misrepresentations to the [Administrative Review Panel], refusing to supply any supporting evidence or reasons, stating its decision as to Plaintiff's health and continuing disability to June 2017 was medically correct and supported." *Id.* ¶ 52.

Flavell claims that, because of the defendants' actions, she incurred medical expenses of $3,375, lost 30 percent of her salary from March 17, 2017, to June 1, 2017, while on disability leave, and incurred legal expenses totally more than $25,000. *Id.* ¶ 118. She also seeks damages for the loss of her job and benefits package, as well as future salary increases. *Id.* Finally, she

4

claims to have suffered mental pain and severe emotional distress worth $1,500,000 in damages. *Id.*

### B. Procedural History

Flavell filed her initial complaint on February 26, 2020 in the Superior Court for the District of Columbia. *See generally* Notice of Removal Ex. A, Dkt. 1. After removal to this Court, Flavell filed a Motion for Leave to File an Amended Complaint, Dkt. 7, which this Court granted by minute order on April 30, 2020. Flavell then filed an amended complaint on June 19, 2020. Am. Compl., Dkt. 10. The amended complaint was 146 pages in length and contained 189 pages of exhibits. *Id.* The Court found that the complaint failed to meet the pleading standards of Federal Rule of Civil Procedure 8(a) and 9(b) as well as the requirements as to form in Rule 10(b) and granted the defendants' motion to dismiss the amended complaint. Order, Dkt. 19. Defendants sought a dismissal with prejudice, but the Court granted Flavell one final opportunity to file an amended complaint that complies with the Federal Rules of Civil Procedure. *Id.*

Flavell's second amended complaint asserts eight claims against the defendants, including negligence (Count I); medical malpractice (Count II), fraud (Count III); negligent misrepresentation (Count IV); tortious interference with contract or business relationship (Count V); intentional infliction of emotional distress (Count VI); violation of the Mental Health Information Act (Count VII); and violation of the Nurse Practice Act (Count VII). The defendants have moved to dismiss Flavell's complaint, *see* Defs.' Mot. to Dismiss, Dkt. 21, and that motion is ripe for review.

## II. LEGAL STANDARDS

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ.

5

P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id*.; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). A complaint need not contain "detailed factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id*. at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). The assumption of truth does not apply, however, to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quotation marks omitted). An "unadorned, the defendant-unlawfully-harmed-me accusation" is not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. Ultimately, "[d]etermining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. When deciding a Rule 12(b)(6) motion, the court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). A

Rule 12(b)(6) dismissal "is a resolution on the merits and is ordinarily prejudicial." *Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1066 (D.C. Cir. 1992).

## III.   ANALYSIS

### A.  Negligence

Flavell alleges that the defendants owed her a duty of care as the administrator of her employer's benefit plan, and that the defendants breached that duty by "engaging in improper or unethical conduct or displaying unreasonable lack of skill by holders of professional or official positions[s]." Compl. ¶¶ 60–61.

"[A] defendant is liable to a plaintiff for negligence only when the defendant owes the plaintiff some duty of care." *Youssef v. 3636 Corp.*, 777 A.2d 787, 792 (D.C. 2001) (citing *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997)). "Whether there is a duty of care is a question of law." *Presley v. Com. Moving & Rigging, Inc.*, 25 A.3d 873, 883 (D.C. 2011). "The plaintiff 'must specify a negligent act and characterize the duty whose breach might have resulted in negligence liability.'" *Smith v. United States*, 157 F. Supp. 3d 32, 40 (D.D.C. 2016) (quoting *District of Columbia v. White*, 442 A.2d 159, 162 (D.C. 1982)). "In general, courts rely on the concept of 'foreseeability' to determine whether the defendant owed a duty to the claimant in a negligence action and examine whether the risk to the claimant was 'reasonably foreseeable' to the defendant." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011) (en banc).

District of Columbia law follows the Second Restatement regarding third party beneficiaries, *see Presley,* 25 A.3d at 889–90, which provides that

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his

>things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
>   (a) his failure to exercise reasonable care increases the risk of such harm, or
>   (b) he has undertaken to perform a duty owed by the other to the third person, or
>   (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (Am. Law Inst. 1965). Accordingly, defendants are only liable to third-party beneficiaries if their alleged negligence caused Flavell "physical harm." *See id.*; *see also Intelect Corp. v. Cellco P'ship GP*, 160 F. Supp. 3d 157, 185 (D.D.C. 2016) (explaining that, in the District of Columbia, "cases finding (or considering) a duty of care [owed to a third party] arising out of a contractual obligation involve[] claims for personal injury or circumstances presenting a risk of personal injury").

Flavell has not plausibly alleged that defendants breached a legal duty of care owed to her. Though she claims otherwise, as contractors hired by Flavell's employer and not by Flavell, *see* Compl. ¶¶ 5, 48, the defendants only owed Flavell a duty as a third-party beneficiary, *see Presley*, 25 A.3d at 888–89 ("In our jurisdiction, we have acknowledged that a legal duty arises when a party undertakes to 'render services to another which he should recognize as necessary for the protection of a third person or his things . . . .'" (quoting Restatement (Second) of Torts § 324A)). And while Flavell alleges that she "suffered emotional distress with physical manifestations," Compl. ¶ 44, even on her third try, she fails to provide any supporting factual allegations as to what, if any, physical harm she suffered. Her allegations thus amount to nothing "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556

8

U.S. at 678. Accordingly, Flavell has not plausibly alleged that the defendants breached a duty of care owed to her, and her negligence claim must be dismissed.[3]

### B. Medical Malpractice

Flavell next alleges that Collier committed medical malpractice by negligently handling Flavell's disability claim, *see* Compl. ¶¶ 68–80, because, among other things, she breached the standard of care for nurse case management and failed to make "accurate heath assessments despite existing medical information provided to her," *id.* ¶ 77.

"In a medical malpractice case, the plaintiff has the burden of proving the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Giordano v. Sherwood*, 968 A.2d 494, 498 (D.C. 2009) (quoting *Derzavis v. Bepko*, 766 A.2d 514, 519 (D.C. 2000)). In addition, "when no prior relationship exists, the physician must take some action to treat the person before the

---

[3] Flavell is mistaken in her assertion that, Reed Group and Collier, as the administrator of her employee's disability plan and as case manager of her disability claim, owed Flavell a fiduciary duty of care arising under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1002 *et seq.* (ERISA). *See* Pl.'s Opp'n at 9. Even if ERISA could set the appropriate standard of care in this case, ERISA specifically excludes from its coverage "payroll practices" which include "[p]ayment of an employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties, or is otherwise absent for medical reasons (such as pregnancy, a physical examination or psychiatric treatment)." 29 C.F.R. § 2510.3-1; *see Foster v. Sedgwick Claims Mgmt. Servs., Inc.*, 842 F.3d 721, 728 (D.C. Cir. 2016) ("Sun Trust's short-term disability plan clearly fits within the regulatory definition of 'payroll practices.'"). To the extent Flavell's complaint can be liberally construed to raise a claim for Negligent Infliction of Emotional Distress, she has also failed to allege she and the defendants "ha[d] a relationship . . . of a nature that necessarily implicate[d] . . . [her] emotional well-being." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d at 810–12; *see also Lesesne v. District of Columbia*, 146 F. Supp. 3d 190, 196–97 (D.D.C. 2015) (arrestee in custodial relationship with correctional officers did not have a relationship that implicated the plaintiff's emotion well-being because the "purpose of the relationship [did not] involve care for another's emotional well-being," *id.* at 196); *id.* at 196 ("If the object of the relationship is not such care, but is rather 'to obtain a financial, commercial or legal objective,' emotional well-being is not necessarily implicated." (internal citations omitted)).

9

physician-patient relationship can be established." *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1034 (D.C. 2015) (quoting *Dehn v. Edgecombe*, 865 A.2d 603, 611 (Md. 2005)). The fact that one party holds a valid medical license does not on its own create a medical relationship. *See id.* at 1034–35.

Here, Flavell has not shown that a physician-patient relationship existed between Collier and her. First, Flavell has not shown that Collier "treated" her. Flavell does not allege that either Collier specifically or Reed Group generally prescribed or recommended any particular course of treatment. Instead, each of the medical evaluations sought by Reed Group was carried out by independent doctors through independent medical examinations, and they were requested not for the purposes of treatment but instead for determinations as to fitness to continue receiving disability payments. Accordingly, Flavell's claim of medical malpractice must be dismissed.[4]

### C. Fraud and Negligent Misrepresentation

Flavell next alleges that Reed Group and Collier "made affirmative material misrepresentations, omitted material facts, and concealed material information in 2017 . . . and 2018 concerning Plaintiff's participation in the disability program." Compl. ¶ 82. These claims include a failure to approve Flavell to return to work after receiving authorization from her physician, an alleged falsification of medical documents to support a period of short-term

---

[4] Flavell suggests that the D.C. Nurse Practice Act sets the relevant standard of care for nurse case management and also serves as evidence that Collier was acting as a medical provider. Pl.'s Opp'n at 15–16. But as Collier points out, "the Nursing Act does not include a provision for *case* management and, instead, only includes one for care management." Defs.' Reply Mem. at 7; *see* D.C. Code § 3-1201.02(15)(H). The term "case management" is not mentioned anywhere in the Act. "Care management," however, is defined "as [p]articipating in nursing care management through delegating to assistive personnel and assigning to other licensed practical nurses nursing interventions that may be performed by others." *Id.* This description clearly contemplates a role in which a nurse facilitates treatment of a patient through delegation to other nurses, a role quite distinct from the benefits-administrative capacity Collier fulfilled.

10

disability, statements made to Flavell that defendants required "further medical evidence, including an [independent medical evaluation] for [long-term disability]," and a representation to Flavell that she needed to sign an allegedly unlawful authorization to share medical information. *Id.*

"The essential elements of common law fraud are: (1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance on the representation." *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 438 (D.C. 2013) (citation omitted). "[A] plaintiff alleging negligent misrepresentations or omissions must show '(1) that [the defendant] made a false statement or omitted a fact that he had a duty to disclose; (2) that it involved a material issue; and (3) that [the plaintiff] reasonably relied upon the false statement or omission to his detriment." *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1131 (D.C. 2015) (citations omitted). "[T]he maker of material misrepresentations may be held liable for losses incurred by third parties who reasonably rely on those representations, so long as the third party falls within an identifiable class of persons that the defendant intended to influence." *Boomer Development, LLC v. Nat'l Ass'n of Home Builders of the U.S.*, 325 F.R.D. 6, 14 (D.D.C. 2018).

Flavell has failed to plausibly allege reliance on the allegedly fraudulent statements and misrepresentations. In her complaint, Flavell claims that, in reliance on Reed Group and Collier's allegedly false representations, she "was induced to undertake further intrusive medical testing and examination, remain without 30% of her salary for a period (disability pay at 70%), remain away from her work for a time critical to her career, resulting in lost credibility with her employer, her ability to regain her position, and ability to receiver [sic] critical job search assistance from IBRD[] HR from March to June 2017 and thereafter, and to take [short term

11

disability] after June 2017." Compl. ¶ 88. But these facts do not show Flavell's reliance on the alleged fraud and misrepresentations. Flavell does not allege to have undergone the independent medical evaluation requested by Reed Group; instead she explains that she rejected the request, opting to schedule another examination with her own physician. *Id*. ¶ 25. Neither can she claim that she relied on the defendants' statements in not returning to work because she attempted to return to her office and was denied entry by her employer. *Id.* ¶ 15. In sum, Flavell's allegations show that she rejected the defendants' claims and defied their requests.

Finally, Flavell's allegations that she was barred from returning to work at a time critical to her career, was prejudiced in the eyes of her employer due to disclosure of medical information, only received 70% of her normal pay, and was denied access to job search assistance does not show that *she* relied on Reed Group's actions. At best, the representation that Flavell was not fit to return to work was relied upon by her employer, not Flavell. Under District of Columbia law, "[a] plaintiff may recover for a defendant's fraudulent statement only if *the plaintiff* took some action in reliance on that statement." *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.,* 525 F.3d 8, 22–23 (D.C. Cir. 2008) (emphasis added) (affirming the dismissal of a plaintiff's fraud claim because, rather than suggesting his own reliance, the plaintiff alleged only that the Patent and Trademark Office relied on the defendant's alleged misrepresentation); *see Busby v. Cap. One, N.A.,* 772 F. Supp. 2d 268, 276 (D.D.C. 2011) (dismissing a plaintiff's claim of fraud when the plaintiff "alleg[ed] that the D.C. Recorder of Deeds and other third parties relied on the misrepresentations" of the defendant). "[R]eliance by 'third parties cannot, standing alone, satisfy the detrimental reliance element required for fraud claims under D.C. law.'" *E. Savings Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 18 (D.D.C. 2014) (quoting *Busby*, 772 F. Supp. 2d at 276).

For these reasons, Flavell has not plausibly alleged reliance on any claimed fraud or misrepresentation and thus these counts must be dismissed.

### D. Tortious Interference[5]

Flavell alleges that Reed Group and Collier "engaged in conduct intentionally preventing or hindering performance of Plaintiff's employment contract" through the alleged unauthorized disclosure of her medical information that caused her employer to lose "confidence in Plaintiff and her abilities," and that this ultimately resulted in "breach of Plaintiff's contract of employment (and its termination)." Compl. ¶ 100. Flavell also claims that defendants "committed the tort of intentional interference throughout the review and appeal process under the disability program" by "refusing to admit its determination as to Plaintiff's medical condition had been erroneous and without any supporting medical evidence." *Id*. ¶ 101.

"A prima facie case of tortious interference with business relations requires: '(1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages.'" *Whitt v. Am. Prop. Constr., P.C.,* 157 A.3d 196, 202 (D.C. 2017) (alterations omitted) (quoting *Newmyer*, 128 A.3d at 1038). "Unlike in some jurisdictions, courts in the District of Columbia have held that a breach of contract is an essential element of the tort." *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 326 (D.C. 2008) (internal quotations and

---

[5] Flavell alleges intentional interference with a contractual and economic relationship as well as tortious interference with contract. Because the elements for these claims are the same, the Court will address them together. See *Langer v. George Wash. Univ.*, 498 F. Supp. 2d 196, 201 (D.D.C. 2007) ("To recover on a claim for intentional interference with contract relations, a plaintiff must ultimately prove (1) the existence of a contract, (2) defendant's knowledge of that contract, (3) intentional procurement of the contract's breach by defendant, and (4) damages resulting from the breach."); *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 202 (D.C. 2017) (same).

13

citation omitted). "Specific facts about the terms of the relationships and whether the employees were subject to at-will employment agreements are necessary to state a plausible claim, because, 'if there is no fixed or assured employment there is nothing tangible with which to interfere.'" *Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*, 208 F. Supp. 3d 219, 229–30 (D.D.C. 2016) (quoting *Dale v. Thomason,* 962 F. Supp. 181, 184 (D.D.C. 1997); *see Riggs v. Home Builders Inst.,* 203 F. Supp. 2d 1, 24 (D.D.C. 2002) (noting that at-will employees do "not have a contractual employment relationship" that can form "the basis for a suit for tortuous [sic] interference with a contractual relationship" (quoting *McManus v. MCI Commc'ns Corp.*, 748 A.2d 949, 957 (D.C. 2000))).

Flavell does not allege that her employment contract was fixed or assured. *See generally* Compl.; *see* Pl.'s Mot. for Leave to File Surreply Ex. A, at 14. If Flavell's contract was at-will, then her employment cannot support a claim of tortious or intentional interference. *See McManus*, 748 A.2d at 957. If Flavell's employment contract was not at-will, she has not adequately specified the nature of the contract and the terms that were breached sufficient to plausibly allege anything "tangible" with which the defendants interfered. *See Econ. Rsch. Servs., Inc.*, 208 F. Supp. 3d at 229–30 (dismissing complaint where the plaintiff "fail[ed] . . . to substantiate [its] claim of an expectancy that [the contractual relationships] would continue," *id.* at 229).

For these reasons, Flavell has not plausibly alleged tortious or intentional interference and those claims must be dismissed.

### E. Intentional Infliction of Emotional Distress (IIED)

In Count VI, Flavell brings a claim of intentional infliction of emotional distress, charging that Reed Group and Collier knew that "their actions/inactions, refusal to carry out

disability program obligations accompanied with fraud, negligence, medical malpractice[,] ill will, recklessness, oppressiveness, willful disregard of Plaintiffs [sic] rights or other circumstances, would cause extreme distress, take a severe toll on the Plaintiff's health, and may cause a relapse." Compl. ¶ 104.

"In order to establish a prima facie case of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Williams v. District of Columbia,* 9 A.3d 484, 493–94 (D.C. 2010) (internal quotation marks and citation omitted). "Liability will be imposed only for conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Grimes v. D.C., Bus. Decisions Info. Inc.*, 89 A.3d 107, 113–14 (D.C. 2014) (quoting *Homan v. Goyal,* 711 A.2d 812, 818 (D.C. 1998), *amended by* 720 A.2d 1152 (D.C.1998) (per curiam)).

"In the employment context, [the D.C. Court of Appeals] traditionally ha[s] been demanding in the proof required to support an [IIED] claim." *Kerrigan*, 705 A.2d at 628. This heightened standard extends to an employer's administrators. *See Elliott v. Healthcare Corp.*, 629 A.2d 6, 9 (D.C. 1993). For instance, in *Kerrigan*, the D.C. Court of Appeals upheld the dismissal of a claim of intentional infliction of emotional distress, finding that the plaintiff failed to sufficiently allege outrageous conduct after his employer allegedly "targeted him for a sexual harassment investigation, manufactured evidence against him in order to establish a false claim of sexual harassment, leaked information from the investigation to other employees, and unjustifiably demoted him to the position of store manager in order to promote a woman to his position." 705 A.2d at 628.

Further, in *Grimes*, the D.C. Court of Appeals affirmed the dismissal of a plaintiff's IIED claim where the plaintiff sued his employer and a third-party investigator, alleging that his employer failed to pay him worker's compensation benefits after relying upon a false investigation and corresponding report produced by the investigator.  There, according to the plaintiff, the third-party investigator "falsely said that from 1998 to 2007, while he was receiving disability benefits, Mr. Grimes also operated 'Grimes & Associates, CPAs,' where he earned income as an accountant" and "falsely accused him of earning income from real-estate investments and pursuing a personal-injury claim on behalf of his deceased father."  89 A.3d at 109.  In dismissing the claims, the D.C. Court of Appeals explained that, "[l]ike the plaintiff's allegations in *Kerrigan* that his employer targeted him for investigation, manufactured false evidence, and leaked that evidence to others, Mr. Grimes's allegations that BDI investigated him, wrote a false report, and published that report to others is conduct attributable to 'employer-employee conflicts [that] do not, as a matter of law, rise to the level of outrageous conduct.'"  *Id.* at 114 (quoting *Kerrigan,* 705 A.2d at 628).

*Grimes* and *Kerrigan* are on all fours with this case.  Reed Group is a third-party benefits administrator contracted to advise an employer of the benefits owed to their employee.  Just as in *Grimes* and *Kerrigan*, the allegedly fraudulent reports, misrepresentations, and unauthorized disclosures of information leading to her termination "is conduct attributable to employer-employee conflicts that do not, as a matter of law, rise to the level of outrageous conduct."  *Id.* (cleaned up).

### F.  Statutory Claims

Finally, the Court will dismiss Count VII, which is labelled "Statutory and Legal Duties Violations" and appears to allege that Collier and Reed Group violated provisions of the D.C.

Mental Health Information Act (DCMHIA) and the D.C. Nurse Practice Act (DCNPA). Compl. ¶¶ 111–14. Flavell's complaint does not specify which provisions of these acts were violated, and she makes no effort to connect the purported violations to her factual allegations. *Id.* Instead, Flavell claims that defendants, in their motion to dismiss, "attempt[ed] to limit the Count to only concerning two statutes, those specifically referenced in the Count, the DC Mental Health Information Act and the DC Nurse Practices Act. *But Count VII is not so limited.*" Pl.'s Opp'n at 38 (emphasis in original). Flavell then references four previously unmentioned District of Columbia statutes that she states are included in the alleged violation "without limitation." *Id.* at 39.

Flavell alleges a general violation of the DCMHIA along with violations of her "statutory and legal rights to confidentiality, privacy and protection of her medical information." Compl. ¶ 111. This could implicate several provisions under the DCMHIA, but in any case, "[a] claim under the DCMHIA . . . must be brought within one year." *Brown v. Hill*, 174 F. Supp. 3d 66, 71 (D.D.C. 2016) (citing D.C. Code § 12–301(9)). Flavell's most recent allegation of any wrongdoing by the defendants occurred in April 2018, Compl. ¶ 56, and her original complaint was filed in February of 2020, *see* Dkt. 1, well over one year later. Thus, any DCMHIA claim is barred by the applicable statute of limitations. *See Brown*, 174 F. Supp. 3d at 71.

The DCNPA does not provide for a private cause of action and thus Flavell cannot bring a claim under the Act. *See* D.C. Code § 3-1210.08(a) ("Prosecutions for violations of this chapter shall be brought in the name of the District of Columbia by the Office of the Attorney General for the District of Columbia."). To the extent that Flavell seeks to use the DCNPA as a standard of care to support a theory of negligence *per se*, as the Court already noted, Flavell has

17

not alleged that either Collier or Reed Group were acting in a medical capacity or treating Flavell and therefore their conduct is not governed by the Act.  *See id.* § 3-1201.02 (definitions of health occupations).  For those reasons, Flavell's claims under the DCNPA must be dismissed.

Finally, because a "plaintiff may not amend her complaint by the briefs in opposition to a motion to dismiss," *Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 87 n.4 (D.D.C. 2010); *see Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003), the Court will not consider Flavell's arguments concerning other potential statutory violations.

## CONCLUSION

For the reasons stated, the Court grants Flavell's Motion to File a Surreply, Dkt. 25, and grants the defendants' Motion to Dismiss, Dkt. 21.  A separate order accompanies this memorandum opinion.